No. 03-388

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 283

STATE OF MONTANA,

   Plaintiff and Respondent,

  v.

MYLES S. EATON,

   Defendant and Appellant.

APPEAL FROM: District Court of the Eighteenth Judicial District,
       In and For the County of Gallatin, Cause No. DC 2002-68,
       Honorable Mike Salvagni, Presiding Judge

COUNSEL OF RECORD:

   For Appellant:

     Christopher Williams, Attorney at Law, Bozeman, Montana

   For Respondent:

     Honorable Mike McGrath, Attorney General; John Paulson,
     Assistant Attorney General, Helena, Montana

     Marty Lambert, County Attorney, Bozeman, Montana

         Submitted on Briefs: April 28, 2004

           Decided: October 18, 2004

Filed:

         Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1      Myles Eaton (Eaton) appeals from the sentence imposed by the Eighteenth Judicial District Court, Gallatin County, following his plea of guilty to felony theft, ordering him to pay full restitution as a condition of his suspended sentence, and to pay a portion of his net income, including any income from social security, toward his restitution obligation. We affirm in part and reverse in part and remand to the District Court.

¶2      We rephrase the issues on appeal as follows:

¶3      1.   Did the District Court err in ordering Eaton to pay restitution as part of his suspended sentence?

¶4      2.   Did the District Court err in ordering Eaton to pay restitution from his "net income," which includes his social security benefits?

### FACTUAL AND PROCEDURAL BACKGROUND

¶5      On September 4, 1997, Eaton was appointed by District Court Judge Thomas Olson to act as a receiver in a lawsuit involving the Sunset Memorial Gardens of Bozeman (the Cemetery). As such, Eaton was charged with the fiduciary responsibility to act in the Cemetery's best interest. However, the District Court began to have suspicions regarding Eaton's actions as receiver in June 2001. On June 26, 2001, James Harris (Harris), Secretary for the Cemetery's Owners Committee, wrote a letter to the District Court complaining that Eaton refused to disclose information regarding the Cemetery's financial situation. Harris also expressed concerns that the Cemetery's bank had failed to pay checks written on the Cemetery's account. Then, on August 9, 2001, Tom Baker (Baker), Dennis Carlson

2

(Carlson), and Harris, members of the Cemetery's Owners Committee, reiterated to the District Court their concerns regarding Eaton's handling of Cemetery's property. Further, on August 21, 2001, Carlson informed the Court that he had obtained documents showing questionable financial transactions on the Cemetery's account. In a letter to the Court, he stated that it appeared that Eaton had withdrawn approximately $1,300.00 dollars from the Cemetery's account, depositing these funds into an account for the Beth Shalom Greater Yellowstone Jewish Community (Temple), for which Eaton was Treasurer.

¶6     Prior to the Cemetery's Owners Committee expressing concerns about Eaton's management of Cemetery funds, the District Court, on July 30, 2001, had ordered Eaton to prepare an accounting in regard to the possible sale of the Cemetery, and set a hearing on the matter for September 10, 2001. At this point, Eaton's financial house of cards began to crumble. At the hearing, the District Court questioned Eaton regarding the concerns expressed by the Cemetery's Owners Committee. Eaton responded by stating any questionable transfer of monies from the Cemetery to the Temple were mere mistakes which he had fixed. However, on September 12, the District Court ordered the accounting firm of Veltkamp, Stannebein, and Bateson, P.C., to audit Eaton's receivership of the Cemetery. Joe Bateson (Bateson) of that firm examined bank statements, accounting records produced by Eaton, accounting records produced by Baker, various deeds and title reports, and copies of various receipts related to Cemetery operations. In addition, Bateson conducted personal interviews with Eaton, members of the Cemetery's Owners Committee and its bank, as well as the Riverside Country Club, to which Eaton belonged. In a report to the District Court,

3

Bateson concluded that between September 1997 and September 2001, checks and other transfers were made from the Cemetery's account to Eaton, or on his behalf, in the amount of $24,498.00. These transactions included deposits into Eaton's personal bank account, payment of Eaton's personal bills, including his Riverside Country Club dues and charges, and deposits into Eaton's personal investment account with Charles Schwab.

¶7 Pending Bateson's report, the District Court conducted a status hearing on November 26, 2001, in which the court suspended Eaton as a receiver of the Cemetery's property. The District Court removed Eaton as receiver for the Cemetery on January 15, 2002, after the court received and reviewed Bateson's report.

¶8 Meanwhile, as the Cemetery's Owners Committee was growing suspicious of Eaton's actions, so were the officers of the Temple, where Eaton acted as Treasurer. On or about August 23, 2001, Jennifer Bordy (Bordy), Temple Director, and Bob Rasmus (Rasmus), Temple President, filed a complaint with the Bozeman Police Department alleging that Eaton had stolen from the Temple. Rasmus told Detective Gappmayer that he learned that checks written on the Temple's account had been dishonored for insufficient funds, that there was an unpaid account opened by Eaton on behalf of the Temple at Staples supply store, and that there were two bank accounts with Western Security Bank in the Temple's name, which the Temple officers (other than Eaton) never knew existed. Because of Rasmus's findings, the Temple retained Certified Public Accountant Randy Newberg (Newberg) to audit its accounts. Newberg discovered that without the Temple's approval, Eaton, on numerous occasions, had kept cash from Temple deposits, cashed and deposited Temple funds into his

4

own personal account, and used Temple funds to pay personal bills, including credit cards, a car loan, telephone expenses, and Riverside Country Club dues and charges. Newberg noted that there were many unexplained ATM withdrawals and transfers between the Temple and Cemetery, with only one connection, that being Eaton.

¶9     On March 29, 2002, the Gallatin County Attorney charged Eaton with two counts of felony theft, common scheme, in violation of § 45-7-301, MCA; one count of perjury, in violation of § 45-7-201, MCA; and one count of tampering with or fabricating physical evidence, in violation of § 45-7-207, MCA. Count I, theft, alleged that from September 1997, through August 2001, Eaton stole money totaling $24,498.00 from the Cemetery. Count II, theft, alleged that from April 1997 through August 2001, Eaton stole money from the Temple totaling $84,556.64.

¶10     On December 3, 2002, Eaton pled guilty to two counts of felony theft, common scheme, in violation of § 45-6-301, MCA, pursuant to a plea agreement. The District Court dismissed the other charges. Following a sentencing hearing, the District Court sentenced Eaton to two consecutive ten-year terms, for a total of twenty years, with fifteen years suspended, at the Montana State Prison. Further, the District Court ordered Eaton to pay restitution and fees totaling $114,520.32. At the sentencing hearing, the District Court ordered Eaton to make payments equal to 20 percent of his net income per month, from any source, including money received from his social security benefits. Eaton did not object to the District Court's order entered on January 21, 2003. He appeals.

5

¶11    We pause to clarify once again the appropriate standard of review for a challenge to a criminal sentence, an issue we addressed at length in *State v. Montoya*, 1999 MT 180, 295 Mont. 288, 983 P.2d 937.  We review a District Court's criminal sentence for legality only. *Montoya,* ¶¶ 15-16; *State v. Heath*, 2004 MT 126, ¶ 13, 321 Mont. 280, ¶ 13, 90 P.3d 426, ¶ 13.  Recently, our cases have cited to an abuse of discretion standard in reviewing criminal sentences in addition to the legality standard, *see State v. Kime*, 2002 MT 38, ¶ 6, 308 Mont. 341, ¶ 6, 43 P.3d 290, ¶ 6 (citing *State v. Horton*, 2001 MT 100, ¶ 17, 305 Mont. 242, ¶ 17, 25 P.3d 886, ¶ 17)*,* despite our holding in *Montoya* to the contrary:  "This Court reviews a criminal sentence only for legality (i.e., whether the sentence is within the parameters provided by statute).  To the extent  that . . . other decisions of this Court suggest that we also review criminal sentences for an abuse of discretion, they are overruled."  *Montoya*, ¶ 15. Thus, our review is confined to legality.  *Montoya*, ¶ 15; *Heath*, ¶ 13.

## *DISCUSSION*

¶12    Before addressing the issues Eaton raises on appeal, we first address the State's procedural argument that Eaton effectively waived his right to appeal the District Court's imposition of restitution by "acquiescing" in that condition.  The State argues that, because of Eaton's failure to object at the sentencing hearing to the District Court's order requiring him to pay full restitution as a condition of his suspended sentence, he failed to preserve the issue for appeal.  The State cites § 46-20-104, MCA, which provides that, generally, a criminal defendant must make a contemporaneous objection in order to preserve an issue on

appeal. Further, the State argues that our holdings in both *State v. McLeod*, 2002 MT 348, 313 Mont. 358, 61 P.3d 126, and *State v. Micklon*, 2003 MT 45, 314 Mont. 291, 65 P.3d 559, require this conclusion. However, we disagree.

¶13 Unlike the defendants in *McLeod* and *Micklon*, Eaton did not "acquiesce" or "actively participate" in the imposition of the sentencing conditions which he now challenges on appeal. First, Eaton is not challenging inaccuracies contained in his presentence investigation report (PSI). *See McLeod*, ¶ 15 (defendant waived his right to challenge incorrect information contained in his PSI report where he had ample time to bring the inaccuracies to the district court's attention and failed to do so). Second, although Eaton offered an apology to the District Court at his sentencing hearing for his failure to make any restitution payments, made statements regarding his assets, including the listing of his home for satisfaction of his sentence, and indicated his wish to make restitution, these statements did not equate with the "active acquiescence" we found had occurred in *Micklon*. *See Micklon*, ¶¶ 4, 10 (defendant waived his right to appeal the district court's order imposing interest on his installment restitution payments when he requested the court allow him to make installment payments in satisfaction of his restitution requirements and agreed to pay interest thereon in response to the district court's questions). Here, Eaton made no such special request to the District Court as did the defendant in *Micklon*. In contrast, Eaton's statement was merely one of remorse. This does not constitute "active acquiescence" upon which we decided *Micklon*.

¶14 While this Court on numerous occasions has held that a defendant must raise an objection in a timely manner or risk waiver of the issue on appeal, *State v. Brister*, 2002 MT

13, ¶ 15, 308 Mont. 154, ¶ 15, 41 P.3d 314, ¶ 15, we have also established an important narrow exception, which we found inapplicable in *McLeod* or *Micklon*, but which is applicable here. In *State v. Lenihan* (1979), 184 Mont. 338, 343, 602 P.2d 997, 1000, we held where a sentence was imposed in a criminal case, and the defendant appeals on the basis that the sentence is illegal or exceeds statutory mandates, "[i]t appears to be the better rule to allow an appellate court [jurisdiction] to review . . . even if no objection is made at the time of sentencing." *Brister*, ¶ 16; *State v. Muhammad*, 2002 MT 47, ¶ 23, 309 Mont. 1, ¶ 23, 43 P.3d 318, ¶ 23. This Court recognizes the often uncertain position that a defendant faces during a sentencing hearing. A defendant who objects to a condition imposed during the sentencing hearing bears the risk that the judge could forgo a more lenient sentence. *Lenihan*, 184 Mont. at 343, 602 P.2d at 1000. Thus, "a defendant often times must remain silent even in the face of invalid conditions," to guard against this possibility. *Lenihan*, 184 Mont. at 343, 602 P.2d at 1000. Eaton's position is no different. Thus, we conclude that Eaton did not waive the issues he raises on appeal.

¶15 **Did the District Court err in ordering Eaton to pay restitution as part of his suspended sentence?**

¶16 Eaton contends that the District Court was without statutory authority to impose restitution as a condition of the suspended portion of his sentence under the 1999 amendments to § 46-18-201, MCA, for the thefts he committed after October 1, 1999. He argues that subsection (2) of § 46-18-201, MCA (1999), "mandate[s] restitution, in addition to other penalties, only in cases where a deferred sentence is imposed."

8

¶17 In making his argument, Eaton raises the same issue that we recently addressed in *Heath*. We held in *Heath*, ¶ 36, that a codification error was made in the 1999 legislative amendments to § 46-18-201, MCA, "which was not intended to make any change in the substance or effect [to § 46-18-201, MCA (1997)]," imposing mandatory restitution when either the district court imposed a deferred or suspended sentence. Thus, based on our holding in *Heath*, the District Court did not exceed statutory authority in ordering Eaton to pay restitution.

¶18 **Did the District Court err in ordering Eaton to pay restitution from his "net income," which is defined as including his social security benefits?**

¶19 Eaton argues that the District Court abused its discretion when it ordered him to make restitution payments equal to the amount of 20 percent of his net income, including income from his social security benefits. He contends that this condition violates 42 U.S.C. § 407(a). While the State argues that the inclusion of Eaton's social security benefits in his net income for the purpose of calculating the amount of monthly restitution payments is not an "execution," "levy," "attachment," "garnishment" or "formal legal process" in violation of § 407(a), we agree with Eaton that the District Court's order improperly burdens his social security benefits.

¶20 Based on the evidence introduced at sentencing, including the testimony of accountants Bateson and Newberg, the District Court ordered Eaton to pay $114,520.32 in restitution. The court ordered Eaton to make payments of 20 percent of his net income and indicated that net income includes income from any source including social security or retirement benefits.

9

¶21 However, the District Court's order conflicted with § 407(a), which provides that "none of the moneys paid or payable . . . under [the Social Security Act] shall be subject to 'execution,' 'levy,' 'attachment,' 'garnishment,' or other 'legal process.'" *See also Bennett v. Arkansas* (1988), 485 U.S. 395, 396, 108 S.Ct. 1204, 1205, 99 L.Ed.2d. 455, 458 (holding that "the express language of § 407(a) and the clear intent of Congress that social security benefits not be attachable"); *Philpott v. Essex County Welfare Bd.* (1973), 409 U.S. 413, 417, 93 S.Ct. 590, 592, 34 L.Ed.2d 608, 611-12 (holding that § 407(a) "imposes a broad bar against the use of any legal process to reach all social security benefits"). In *Washington State Dept. of Social and Health Services v. Guardianship* (2003), 537 U.S. 371, 385, 123 S.Ct. 1017, 1025, 154 L.Ed.2d. 972, 974-75, the United States Supreme Court held that "execution," "levy," "attachment," "garnishment," or "other legal process" "are terms of art referencing to formal procedures by which one person gains a degree of control over property otherwise subject to the control of another, and generally involves some form of judicial authorization." *See also* The Social Security Administration's Program Operations Manual System, POMS GN 02410.001 (2002) (available at http://policy.ssa.gov/poms.nsf/aboutpoms) (defining "legal process" as used in § 407(a) as "the means by which a court compels compliance with its demands, generally, it is a court order).

¶22 Here, the order is an improper attempt to subject Eaton's social security benefits to "other legal process." The State concedes that a direct attempt to levy upon social security benefits would violate § 407(a), but argues that Eaton can raise this defense at the time it

would seek a levy. However, it is appropriate to eliminate the offending condition from the judgment in the first instance.

¶23 Thus, the judgment's inclusion of Eaton's social security income conflicts with the provisions of § 407(a), and we reverse the inclusion thereof.

¶24 We affirm in part, reverse in part and remand for entry of an amended judgment consistent herewith.

/S/ JIM RICE

We concur:

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ W. WILLIAM LEAPHART
/S/ JOHN WARNER

11